# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN FAUST and LORI ESHENAUR, as Trustees of the SHEET METAL WORKERS LOCAL 44 RETIREMENT INCOME PLAN, SHEET METAL WORKERS LOCAL 44 ANNUITY FUND, SHEET METAL WORKERS LOCAL 44 WELFARE FUND, and SHEET METAL INDUSTRY EDUCATION FUND, <br><br> Plaintiffs, <br><br> v. <br><br> SUMMIT SHEET METAL, LLC, <br><br> Defendant. | NO. 3:14-CV-0607 <br><br> (JUDGE CAPUTO) |

## MEMORANDUM

Plaintiffs Warren Faust and Lori Eshenaur, as trustees of the Sheet Metal Workers Local 44 Retirement Income Plan, Sheet Metal Workers Local 44 Annuity Fund, Sheet Metal Workers Local 44 Welfare Fund, and Sheet Metal Industry Education Fund ("Plaintiffs"), commenced this action for unpaid contributions under the terms of a collective bargaining agreement and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. The matter proceeded to a bench trial, and the parties filed post-trial briefs and proposed findings of fact and conclusions of law. Set forth below are my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I. Findings of Fact and Procedural Background

Plaintiffs Warren Faust and Lori Eshenaur are trustees of the Sheet Metal Workers Local 44 Retirement Plan, Sheet Metal Workers Local 44 Annuity Fund,

Sheet Metal Workers Local 44 Welfare Fund, and Sheet Metal Industry Education Fund (collectively, the "Funds"). (*See* Sept. 5, 2017 Trial Tr. ("Tr."), Ex. P-15, ¶ 1).[1] Each Fund is structured as a multiemployer employee benefit plan within the meaning of Sections 3(3) and 3(37) of ERISA. (*Id*. at ¶¶ 3-6); *see also* 29 U.S.C. § 1002(3), (37). Summit Sheet Metal, LLC ("Summit") is an employer and Local Union No. 44, Sheet Metal Workers International Association ("Local 44") is an employee within the meaning of the statute. (*See* Tr., Ex. P-15, ¶¶ 8-9); *see also* 29 U.S.C. § 1002(4)-(5).

On August 2, 2011, Summit signed a "Form Letter of Assent" by which it agreed to abide by the 2010-2013 Agreement between Local 44 and SMACNA of Northeastern Pennsylvania, Inc. (*See* Tr., Ex. P-15, ¶¶ 10 and Ex. P-5). After Local 44 provided notice to Summit in January 2013 that it intended to reopen the collective bargaining agreement, Summit informed Local 44 that it did not intend to renew the 2010-2013 Agreement. (*See* Tr., Ex. P-15, ¶¶ 13-15, 17-19).

The issue of whether Summit was bound to a successor agreement through interest arbitration was litigated in this Court, and Summit was ordered to comply with the 2013-2016 successor Agreement between Local 44 and SMACNA of Northeastern Pennsylvania, Inc. *See Summit Sheet Metal, LLC v. Sheet Metal Workers' Int'l Ass'n,*, No. 13-1623, 2014 WL 1315395, at *13 (M.D. Pa. Mar. 28, 2014), *aff'd*, 594 F. App'x 733 (3d Cir. 2014). Shortly after judgment was entered in favor of Local 44 in that litigation, Plaintiffs commenced this action for unpaid contributions under the 2013-2016 Agreement and ERISA. (*See* Doc. 1, *generally*).

Both the 2010-2013 and 2013-2016 Agreements described the nature and scope of work covered to include "the rates of pay and conditions of employment of all employees of the Employer engaged in but not limited to the . . . fabrication, . . .

---

[1] Plaintiffs, in lieu of testimony at trial, presented a jointly agreed upon stipulation of facts and agreed upon exhibits. (*See* Tr., 3:6-6:16). Defendant also presented testimony from two witnesses as well as an additional exhibit. (*See id*. at 7:15-35:11 & Ex. D-1).

2

installation . . . of all ferrous or nonferrous metal work and all other materials used in lieu therefore and of all HVAC systems . . . ." (Tr., Ex. P-5, Art. I, § 1 and Ex. P-6, Art. I, § 1). The 2013-2016 Agreement provided for the payment of contributions to the Funds as follows:

> **11. Payment to Funds**: Payment of all funds are due by the 20th of the month following month reported: 5% penalty if not paid on the 20th of the month due; 1 ½% interest penalty per month on the unpaid balance, including the penalty.
>
> (A) If any Employer is delinquent in his payments to a fund, the Trustee of such Fund may declare such Employer in Violation of the Labor Agreement and so notify the Employer by suitable means as the said Trustee may decide.
>
> (B) From the date of the notification forward, the Local Union shall not supply the notified employer with any additional men.
>
> (C) If after an additional 10 working days from the date of such notification the Employer has not paid sufficient monies into the Fund to which his contributions are delinquent, such that he is no longer delinquent, then the Local Union shall remove all its members from that Employer's shop and all its operations. . . .

(Tr., Ex. P-6, Addendum #1, ¶ 11). The hourly rates of contributions due to the Funds were set forth by schedules. (*See* Tr., Ex. P-15, ¶¶ 28-30).

The Funds did not receive any contributions from Summit by the respective due dates for any month from May 2013 through December 2014. (*See id*. at ¶ 32). Eugene Shane Ruggere ("Mr. Ruggere"), Summit's owner, admitted at trial that no contributions were made to the Funds by Summit after April 2013, but he testified that he treated his employees as non-union employees and Summit was not submitting any papwerwork to the union at that time. (*See* Tr., 14:5-10, 16:8-18). Additionally, Summit was paying for insurance for these employees and funding their 401(k)s. (*See id*. at 15:22-24). Local 44 did not inquire about any contributions at that time, (*see id*. at 16:19-24), and even after Summit failed to make contributions to the Funds during this time, Local 44 did not pull workers off Summit's jobsite. (*See* Tr., 13:24-14:8; Tr., Ex-P15, ¶ 27). However, Ruggere testified that his employees were performing

3

sheet metal work after April 2013. (*See* Tr., 8:19-21, 18:12-19:2). Having not received contributions for these months, Warren Faust eventually contacted Summit and was provided information showing the hours worked for Summit employees from May 2013 through December 2014. *(See* Tr., Ex. P-15, ¶¶ 33-35). The contributions due to each of the Funds on account of the hours worked for this period are: Retirement Plan - $17,779.50; Annuity Fund - $11,257.00; Welfare Fund - $31,274.10; and Education Fund - $2,965.30, totaling $63,275.90 in unpaid contributions. (*Id*. at ¶ 36; Tr., Ex. P-12). The amount of liquidated damages due under the Agreement is $3,163.78. (*See* Tr., Ex. P-15, ¶ 37; *see also* Doc. 32, ¶ 34). And, interest on the unpaid contributions amounts to $40.819.00. (*See* Tr., Ex. P-15, ¶ 38; *see also* Doc. 32, ¶ 35).

## II. Conclusions of Law

It is undisputed that Summit made no contributions to the Funds from May 2013 to December 2014. (*See* Tr., 14:5-10 and Ex. P-15, ¶¶ 32, 35-38). Nevertheless, Summit contends that it was not obligated to do so, or, alternatively, that its maximum exposure for unpaid contributions is sixty (60) days under the terms of the 2013-2016 Agreement.[2] For reasons explained below, Summit is liable to the Funds for unpaid contributions, interest, liquidated damages, and attorneys' fees.

Section 515 of ERISA states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. If a fund successfully establishes a statutory right to delinquent contributions, ERISA entitles the fund to the unpaid contributions, as well as interest

---

[2] As it has already been judicially determined that Summit was in fact bound by the terms of the 2013-2016 Agreement, Summit's suggestion otherwise is simply without merit. *See Summit Sheet Metal*, 2014 WL 1315395, at *13, *aff'd*, 594 F. App'x 733.

4

thereon, liquidated damages, attorneys' fees and costs. *See* 29 U.S.C. § 1132(g)(2). Liquidated damages shall be the greater of the unpaid interest or any amount contemplated under the plan not more than twenty percent (20.00%) of the unpaid contributions. *See id*. at § 1132(g)(2)(C).

In enacting Section 515, Congress intended to ratify the United States Supreme Court's holding in *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470-71, 80 S. Ct. 489, 495-96, 4 L. Ed. 2d 442 (1960). *See Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1102-03 (3d Cir. 1996) (citing *Lewis*, 361 U.S. at 470-71, 80 S. Ct. 489). Congress, by passing Section 515, "sought to ensure that benefit plans are able to rely on contribution promises of employers 'because plans must pay out to beneficiaries whether or not employers live up to their obligations.'" *Id*. at 1103 (quoting *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir. 1990)). Section 515 allows multiemployer welfare funds to rely upon the terms of collective bargaining agreements and plans as written, thus "permit[ting] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law" because "employer delinquency detract[ed] from the ability of plans to formulate or meet funding standards and adversely affect[ed] the financial health of plans." *Id*. (citations omitted).

Under Section 515,

> [t]he pension or welfare fund is like a holder in due course in commercial law . . . [and thus] entitled to enforce the writing without regard to understandings or defenses applicable to the original parties. Multiemployer welfare funds are not participants in collective bargaining agreement negotiations and typically have no knowledge of the nature of the original dealings between the union and the employer. Instead, they rely upon the accuracy of the terms of the collective bargaining agreements of all of their members in making the actuarial calculations that produce their contribution and payout systems for all of their members.

*Id*. (citations and quotation omitted).

Section 515 "severely limit[s] the defenses available to an employer who has

5

signed an agreement which commits it to make contributions to a benefit fund," *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 490 (3d Cir. 1994), and it precludes "employers from raising a variety of contract defenses as a means of avoiding the obligation to contribute to employee benefit plans." *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992). The Third Circuit has identified only three defenses to delinquency: (1) the contributions are themselves illegal; (2) the collective bargaining agreement is void *ab initio*; and (3) the employees have voted to decertify the union as its bargaining representative, thus prospectively voiding the union's collective bargaining agreement. *Id*.

At trial, it was established, both by stipulation and testimony from Summit's owner, that Summit did not pay any contributions to the Funds for the month from May 2013 through December 2014 in the amounts as set forth above. (*See* Tr., 14:5-10 and Ex. P-15, ¶¶ 32, 35-38). Moreover, none of the defenses to an employer's obligation under Section 515 to make contributions to a multiemployer benefit plan in accordance with the terms of the collective bargaining agreement that are recognized by the Third Circuit were established at trial. First, no evidence was presented suggesting that the contributions are illegal. *See, e.g.*, *Kelly v. Gas Field Specialists, Inc.*, No. 14-4, 2015 WL 4926576, at *5 (M.D. Pa. Aug. 18, 2015) (granting the plaintiff funds' motion for summary judgment as to liability). Second, there is nothing in the record indicating that Summit's employees voted to decertify the union. *See id*. And, finally, the trial record contains no evidence to find that the collective bargaining agreement is void *ab initio*. *See id*. Further, Summit's defense based on Local 44's purported breaches of the collective bargaining agreement fails because "employers cannot wield a union's breach of a collective bargaining agreement as a defense against third-party funds seeking delinquent contributions." *Kelly v. Gas Field Specialists, Inc.*, No. 14-0004, 2017 WL 2869004, at *2 (M.D. Pa. July 5, 2017) (citing *Lewis*, 361 U.S. at 470-71, 80 S. Ct. 489). As such, Summit is liable to the Funds under ERISA Section 515 for the unpaid contributions from May

6

2013 to December 2014, liquidated damages, interest, and attorneys' fees and costs.

### III. Conclusion

Based on the foregoing, judgment will be entered in favor of Plaintiffs and against Summit. Summit shall pay delinquent contributions for the months of May 2013 through December 2014 in the following amounts: $17,779.50 to the Retirement Fund; $11,257.00 to the Annuity Fund; $31,274.10 to the Welfare Fund; and $2,965.30 to the Education Fund, totaling $63,275.90 in unpaid contributions. (*Id*. at ¶ 36; Tr., Ex. P-12). Summit shall also pay liquidated damages to the Funds in the amount of $3,163.78 and interest in the amount of $40.819.00. Plaintiffs will also be given twenty-one (21) days from the date of entry of the accompanying Order to file a petition for attorneys' fees and costs.

An appropriate order and judgment follows.


January 25, 2018                             /s/ A. Richard Caputo
Date                                         A. Richard Caputo
                                             United States District Judge